******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

VINCENT BIFOLCK, EXECUTOR (ESTATE OF
JEANETTE D. BIFOLCK), ET AL. *v.*
PHILIP MORRIS, INC.
(SC 19310)

Rogers, C. J., and Zarella, Eveleigh, McDonald, Espinosa, Robinson and
Vertefeuille, Js.

*Argued September 13—officially released December 29, 2016\**

*David S. Golub*, with whom were *Jonathan M. Levine*
and, on the brief, *Marilyn J. Ramos*, for the appellants (plaintiffs).

*John C. Massaro*, with whom were *Francis H. Morrison III* and, on the brief, *Anthony J. Franze*, pro hac
vice, *John B. Daukas*, pro hac vice, *John M. Tanksi*
and *Michael K. Murray*, for the appellee (defendant).

*Jonathan M. Hoffman*, pro hac vice, *Cristin E. Sheehan* and *Kaelah M. Smith* filed a brief for the Product Liability Advisory Council, Inc., as amicus curiae.

*Daniel S. Rawner* and *Kenneth J. Parsigian*, pro hac vice, filed a brief for the Chamber of Commerce of the United States of America as amicus curiae.

*George Jepsen*, attorney general, *Gregory T. D'Auria*, solicitor general, and *Phillip Rosario*, *Jonathan J. Blake* and *Thomas J. Saadi*, assistant attorneys general, filed a brief for the state of Connecticut et al. as amici curiae.

*John J. Robinson* and *Cullen W. Guilmartin* filed a brief for the Connecticut Defense Lawyers Association as amicus curiae.

*Randall L. Goodden* filed a brief for the International Product Safety and Liability Prevention Association as amicus curiae.

*Jennifer M. DelMonico*, *Proloy K. Das*, *Eric B. Miller* and *Terence J. Brunau* filed a brief for the Connecticut Business and Industry Association et al. as amici curiae.

*Brenden P. Leydon* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*Larry A. Tawwater*, *Alinor Sterling* and *Jeffrey R. White* filed a brief for the American Association for Justice as amicus curiae.

*Michael G. Rigg* filed a brief for Aaron D. Twerski et al. as amici curiae.

*Opinion*

McDONALD, J. This case is the second of two diversity actions in which the federal courts certified questions for this court's advice regarding the viability of an action under Connecticut's Product Liability Act (act)[1] alleging that a cigarette's design had increased consumers' risk of cancer. The courts sought advice whether specific theories advanced in those actions are precluded by this court's adoption of § 402A of the Restatement (Second) of Torts, which imposes liability for defective products that are "unreasonably dangerous," and more particularly, our adoption of comment (i) to § 402A, which defines that term in relation to consumers' knowledge of the danger.[2] In the first of these actions, this court advised that the strict liability theory advanced was not precluded because it required application of our modified consumer expectation test, under which the obviousness of the danger is only one of many factors that the trier of fact may consider. *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, 321 Conn. 172, 177, 136 A.3d 1232 (2016).

In the present action, this court considers three substantive questions: (1) whether, for claims alleging design defects, we should abandon our dual tests based on § 402A of the Restatement (Second) of Torts and adopt the standards under the Restatement (Third) of Torts, Products Liability; (2) if not, whether § 402A and comment (i) provide a single, unitary definition for all theories under which product liability claims may be brought, including negligence; and (3) whether the punitive damages available in the act are limited to litigation costs under our common-law punitive damages rule. This court raised the first question; we accepted certification with respect to the second and third questions, pursuant to General Statutes § 51-199b (d), from the United States District Court for the District of Connecticut. See *Bifolck* v. *Philip Morris, Inc.*, Docket No. 3:06cv1768 (SRU), 2014 WL 585325 (D. Conn. February 14, 2014).

For the reasons that follow, we decline at this time to adopt the Restatement (Third). Nonetheless, we are persuaded that modest refinements to our product liability tests under the Restatement (Second) will clarify the plaintiff's burden of proof in strict liability cases and provide a better guide to any necessity for adopting the Restatement (Third) or any other substantive change. We further conclude that, although all product liability claims require proof of a "defective condition unreasonably dangerous" to the user or consumer, unreasonably dangerous is not determined by consumer expectations under comment (i) to § 402A when such a claim may be brought under a theory of negligence. Finally, we conclude that punitive damages under the act are not limited by the common-law rule. Accordingly, we answer both of the certified questions "No."

I

BACKGROUND OF THE PRESENT CASE

The following facts and procedural history gave rise to the issues presently before us. The plaintiff, Vincent Bifolck, individually and as executor of the estate of his wife, Jeanette D. Bifolck (decedent), commenced this action in the District Court against the defendant, Philip Morris, Inc., after the decedent succumbed to lung cancer at the age of forty-two. The principal thrust of the complaint is that the Marlboro and Marlboro Light cigarettes manufactured by the defendant and smoked by the decedent were defectively designed and that this defective design was responsible for her lung cancer and death from that disease. The plaintiff sought compensatory damages, as well as statutory punitive damages under General Statutes § 52-240b.

One count of the complaint asserted a product liability claim under the act, but set forth separate allegations in support of theories of strict liability and negligence.[3] With respect to strict liability, the plaintiff alleged that the defendant's cigarettes were defective and unreasonably dangerous in that their design rendered the cigarettes unnecessarily addictive and unnecessarily carcinogenic. Specifically, the plaintiff alleged that the defendant had (1) added ingredients, including carcinogenic ingredients, that altered the natural form of the tobacco in the cigarettes, and (2) utilized manufacturing processes that affected the composition and form of the tobacco and nicotine, as well as the manner in which the cigarette smoke was transmitted to the smoker. With respect to negligence, the plaintiff alleged that the defendant had failed to conform to the applicable standard of care by knowingly designing the cigarettes in a manner that enhanced their addictive and cancer causing nature and by failing to take available measures to reduce the cigarettes' addictive, toxic, and cancer causing ingredients/properties.

After the plaintiff commenced the present action, judgment was rendered in the District Court in another action against a different cigarette manufacturer on the basis of similar allegations of strict liability and negligence. See *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, 806 F. Supp. 2d 516, 519–20 (D. Conn. 2011). Following the appeal by the defendant, R.J. Reynolds Tobacco Company, from that judgment to the United States Court of Appeals for the Second Circuit, that court certified the following question to this court: "Does [comment (i)] to § 402A of the Restatement (Second) of Torts preclude a suit premised on *strict products liability* against a cigarette manufacturer based on evidence that the defendant purposefully manufactured cigarettes to increase daily consumption without regard to the resultant increase in exposure to carcinogens, but in the absence of evidence of adulteration or con-

tamination?" (Emphasis added.) *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, 731 F.3d 164, 169 (2d Cir. 2013). A particular focus of that question related to an example in comment (i) providing that "good tobacco" is not unreasonably dangerous. See footnote 2 of this opinion.

The trial in the present case was postponed to await this court's response to that question. In the intervening period, the District Court certified two additional questions to this court for advice: (1) "Does [§] 402A of the Restatement (Second) of Torts (and comment [i] to that provision) apply to a product liability claim for negligence under [the act]?"; and (2) "Does Connecticut's [common-law] rule of punitive damages as articulated in *Waterbury Petroleum Products*, *Inc.* v. *Canaan Oil & Fuel Co.*, 193 Conn. 208 [477 A.2d 988] (1984), apply to an award of statutory punitive damages pursuant to [General Statutes] § 52-240b, the punitive damages provision of the [act]?" *Bifolck* v. *Philip Morris*, *Inc.*, supra, 2014 WL 585325, *8.

After oral argument to this court on both cases, we issued our decision in *Izzarelli*, in which we advised that comment (i) to § 402A did not preclude the strict liability theory advanced. *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, supra, 321 Conn. 177. We clarified that, although the two tests available under our law—the ordinary consumer expectation test and the modified consumer expectation test—both apply § 402A's unreasonably dangerous standard, "the modified consumer expectation test is our primary strict product liability test, and the sole test applicable to the present case. Because the obvious danger exceptions to strict liability in comment (i) to § 402A of the Restatement (Second), including '[g]ood tobacco,' are not dispositive under the multifactor modified consumer expectation test, we answer the certified question in the negative." Id.

The jury in *Izzarelli* had been instructed on both strict liability tests and rendered a general verdict in favor of the plaintiff. Id., 182. Neither party had advocated for application of any test other than one of the two tests based on the Restatement (Second) recognized by this court. Id., 192 n.11. Nonetheless, a concurring opinion took the position that we should adopt and apply to the certified question in that case the standard for design defects under the Restatement (Third). Id., 211 (*Zarella, J.*, concurring).

Although that position did not garner majority support in that case, the posture of the present case is more conducive to consideration of this issue. Unlike *Izzarelli*, this case has not yet proceeded to trial. Accordingly, the issue raised by the *Izzarelli* concurrence can be considered with the benefit of supplemental briefing, but without the possibility of disturbing a presumptively valid verdict under the existing standards in the absence of a challenge to those standards.

In light of these considerations, we issued an order to the parties in the present case, concurrently with the issuance of our decision in *Izzarelli*, seeking supplemental briefs on the following questions: (1) whether, for product liability actions premised on design defects, this court should abandon the ordinary consumer expectation test/modified consumer expectation test and adopt §§ 1, 2 (b) and 4 of the Restatement (Third), with or without the associated commentary;[4] and (2) if so, whether there is any reason why this court should not apply the Restatement (Third) standard to cases pending before a trial court, like the present case. We also invited professional organizations to submit amicus briefs on the first question. Pursuant to the parties' joint request, the court heard oral argument on these questions.

## II

## WHETHER TO ABANDON THE RESTATEMENT (SECOND) IN FAVOR OF THE RESTATEMENT (THIRD) FOR DESIGN DEFECT CLAIMS[5]

We begin with the question that this court raised because its answer could be dispositive of the first certified question regarding whether consumer expectations under comment (i) to § 402A govern recovery for a defective design under a theory of negligence. See Restatement (Third), supra, § 2, comment (g), pp. 27–28 (explaining that "consumer expectations do not constitute an independent standard for judging the defectiveness of product designs" and that such expectations are "relevant" but not controlling).

### A

### Parties' Positions

The parties and the amici supporting their respective positions take sharply divergent views on every consideration relevant to this issue. The plaintiff urges us not to abandon our dual Restatement (Second) tests, characterizing the Restatement (Third) as a significant departure from our long-standing strict liability standard and the public policies that this standard advances. Conversely, the defendant urges us to adopt the Restatement (Third), characterizing it as consistent with our case law, our act, and litigation practice. To the extent that both parties acknowledge that the Restatement (Third) will make some change to our product liability law, they point to different effects of those changes. The plaintiff contends that these changes will have a detrimental, unfair effect on injured consumers, whereas the defendant contends that these changes will provide greater clarity and objectivity without such effects. The plaintiff contends that the task of weighing the numerous policy considerations implicated is better left to the legislature, whereas the defendant contends that the issue should be resolved by this court.

## B

## Current Standard under Our Law[6]

Prior to 1965, plaintiffs in Connecticut relied on theories of negligence and breach of warranty in actions to recovery for injuries caused by defective products.[7] In 1965, Connecticut adopted the strict liability standard for product liability actions under § 402A of the Restatement (Second), under which a plaintiff need not establish the manufacturer's fault. See *Garthwait* v. *Burgio*, 153 Conn. 284, 289–90, 216 A.2d 189 (1965); 2 Restatement (Second), Torts, § 402A, comment (a), p. 348 (1965) (product seller is "subject to liability to the user or consumer even though he has exercised all possible care in the preparation and sale of the product"). Under that standard, a manufacturer or seller of a product may be held liable if the product is "unreasonably dangerous . . . ."[8] 2 Restatement (Second), supra, § 402A (1), p. 347. A primary justification for imposing strict liability has been that, as between the injured consumer and the manufacturer who has derived the economic benefits from the sale of the product, the latter is better able to insure against the risk and can pass that cost along to all consumers. See *Potter* v. *Chicago Pneumatic Tool Co.*, 241 Conn. 199, 209, 694 A.2d 1319 (1997).

Originally, this court defined unreasonably dangerous solely by reference to consumer expectations as set forth in comment (i)—the ordinary consumer expectation test. See id., 214–15 ("[T]he article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer . . . with the ordinary knowledge common to the community as to its characteristics. 2 Restatement [Second], supra, § 402A, comment [i]." [Internal quotation marks omitted.]); see also *Giglio* v. *Connecticut Light & Power Co.*, 180 Conn. 230, 234, 429 A.2d 486 (1980); *Slepski* v. *Williams Ford, Inc.*, 170 Conn. 18, 23, 364 A.2d 175 (1975).

In 1997, this court rejected the argument that, for design defects, we should adopt the standard in the draft Restatement (Third), requiring proof of a reasonable alternative design, instead of § 402A's unreasonably dangerous standard. See *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 215. In *Potter*, the court acknowledged a concern expressed by one court that design defects lacked an objective standard by which they may be proved, whereas manufacturing defects could be objectively evaluated against the intended design of the product. Id., 211, citing *Caterpillar Tractor Co.* v. *Beck*, 593 P.2d 871, 880 (Alaska 1979). Nonetheless, the court declined to adopt the alternative design requirement, noting that the majority of jurisdictions had not imposed such an absolute requirement. *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 216. More fundamentally, the court rejected this requirement

because it "imposes an undue burden on plaintiffs that might preclude otherwise valid claims from jury consideration." Id., 217. The court posited that the rule would require expert witnesses, even when the jury could infer a design defect from circumstantial evidence, in contravention to our case law. Id., 217–18. It also posited that a product could be unreasonably dangerous to the consumer even when there is no alternative, safer design. Id., 219.

The court's review of the various tests adopted by other jurisdictions convinced it, however, that our singularly focused consumer expectation test might also preclude some valid claims. Id. Therefore, instead of imposing a more stringent standard of proof, the court established an alternative means of proving that a design defect is unreasonably dangerous—the modified consumer expectation test. Id., 220. Under this test, a product is unreasonably dangerous if a reasonable, informed consumer would conclude that its risks outweigh its utility. Id., 220–21. This is a multifactor test, under which no single factor is per se determinative. See id., 221 n.15 (citing nonexclusive list of factors, including "the usefulness of the product, the likelihood and severity of the danger posed by the design, the feasibility of an alternative design, the financial cost of an improved design, the ability to reduce the product's danger without impairing its usefulness or making it too expensive, and the feasibility of spreading the loss by increasing the product's price or by purchasing insurance" [internal quotation marks omitted]). Evidence that an alternative design was available that would have reduced or avoided the danger may be proffered, but it is not a mandatory element of the plaintiff's case. Id., 221. The court emphasized in adopting this test that it maintained its allegiance to a strict liability regime that focuses on the product's danger and not the manufacturer's culpability. Id., 221–22.

Whereas *Potter* established dual tests to prove that a design defect is unreasonably dangerous, our recent decision in *Izzarelli* clarified the circumstances under which each test applies. See *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, supra, 321 Conn. 192, 202–203. The modified consumer expectation test is our primary test. Id., 194. The ordinary consumer expectation test is reserved for those cases in which the product failed to meet consumers' legitimate, commonly accepted, *minimum* safety expectations. Id., 202–203. The defect in such cases is so obvious that expert testimony is not needed to establish it and the utility of the product is not an excuse for the undisclosed defect. Id., 194, 202–203.

In sum, under either test, § 402A provides the elements of a strict product liability claim; see footnote 8 of this opinion; but the unreasonably dangerous element is determined by minimum safety expectations in one and by balancing risks and utility in the other. *Izzarelli* v.

*R.J. Reynolds Tobacco Co.*, supra, 321 Conn. 193, 208–209.

C

Standard under the Restatement (Third)

Unlike § 402A's "unreasonably dangerous" standard, which applies to any type of product defect, § 2 of the Restatement (Third) prescribes different standards for each of the three categories of product defects—design defects, manufacturing defects and defects due to inadequate instructions/warnings. A product "is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe . . . ."[9] Restatement (Third), supra, § 2 (b), p. 14.

The comments elaborate on the practical application of this standard. They explain that this standard "adopts a reasonableness ('risk-utility balancing') test as the standard for judging . . . defectiveness . . . ." Id., comment (d), p. 19. "A broad range of factors may be considered in determining whether an alternative design is reasonable and whether its omission renders a product not reasonably safe. The factors include, among others, the magnitude and probability of the foreseeable risks of harm, the instructions and warnings accompanying the product, and the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing. . . . The relative advantages and disadvantages of the product as designed and as it alternatively could have been designed may also be considered. Thus, the likely effects of the alternative design on production costs; the effects of the alternative design on product longevity, maintenance, repair, and esthetics; and the range of consumer choice among products are factors that may be taken into account." (Citation omitted.) Id., comment (f), p. 23.

The design defect standard under § 2 is not the exclusive means of establishing liability for a design defect. The Restatement (Third) acknowledges three other standards under which a design defect could be established.

A comment to § 2 recognizes the possibility that courts could determine that some products were "so manifestly unreasonable, in that they have low social utility and high degree of danger, that liability should attach even absent proof of a reasonable alternative design." Id., comment (e), pp. 21–22. The example provided of a product that would satisfy this standard is an exploding novelty cigar that causes burns to the user's face. Id., illustration (5), p. 22. This standard will not apply "in most instances even though the plaintiff

alleges that the category of product sold by the defendant is so dangerous that it should not have been marketed at all." Id., comment (d), p. 20.

In addition, § 3 recognizes that circumstantial evidence alone may support the inference of a product defect.[10] Id., § 3, p. 111. Essentially, this section states the contours of the "malfunction" theory that has long been recognized under Connecticut's § 402A case law.[11] See *Metropolitan Property & Casualty Ins. Co.* v. *Deere & Co.*, 302 Conn. 123, 132–33, 25 A.3d 571 (2011); see also *Living & Learning Centre, Inc.* v. *Griese Custom Signs, Inc.*, 3 Conn. App. 661, 664, 491 A.2d 433 (1985) ("It is not necessary that the plaintiff in a strict tort action establish a specific defect as long as there is evidence of some unspecified dangerous condition. In the absence of other identifiable causes, evidence of malfunction is sufficient evidence of a defect under § 402A of the [Restatement (Second) of Torts]."). This standard "most often [will] apply to manufacturing defects, [but] occasionally a product design causes the product to malfunction in a manner identical to that which would be caused by a manufacturing defect." Restatement (Third), supra, § 3, comment (b), p. 112.

Also, § 4 (a) of the Restatement (Third) provides that "a product's noncompliance with an applicable product safety statute or administrative regulation renders the product defective with respect to the risks sought to be reduced by the statute or regulation . . . ." Liability may not be assessed if the law is unclear as to its meaning or purpose, or conflicts with other safety laws with which the manufacturer must comply. Id., comment (d), p. 121.

It is evident that these three alternatives to the standard under § 2 (b) have a narrow field of operation. Few products will have such a marginal utility and such a high degree of risk akin to the cartoonish example of the exploding cigar that will satisfy the manifestly unreasonable standard. See A. Twerski & J. Henderson, Jr., "Manufacturers' Liability for Defective Product Designs: The Triumph of Risk-Utility," 74 Brook. L. Rev. 1061, 1071 (2009) (authors who served as coreporters of Restatement [Third] acknowledged that "comment [(e) to § 2] speaks merely of the possibility that courts might encounter an unusual case in the future—it does not endorse or recommend the imposition of category liability" and that coreporters hoped to "disarm [that possibility] by dealing with it forthrightly [and narrowly] in comment [e]"). Only occasionally will a design defect cause a product to malfunction in a manner identical to a manufacturing defect. Rarely will manufacturers wholly disregard plain and unambiguous product safety laws. Therefore, it is clear that the standard under § 2 (b) is intended to apply in all but the rarest cases.[12]

As such, we focus our attention on the differences between this predominant standard and our tests under

§ 402A. Section 2 (b) imposes two requirements that are not mandated under our § 402A tests: (1) proof that the harm was foreseeable; and (2) proof that a reasonable alternative design existed that would have reduced or avoided the danger. Restatement (Third), supra, § 2 (b), p. 14. The comments explain that the rule under § 2 (b) is stated in functional terms rather than traditional doctrinal categories (i.e., strict liability, negligence, implied warranty). Id., § 2, comment (n), p. 35. Nonetheless, the comments also acknowledge that § 2 (b) "achieve[s] the same general objectives as does liability predicated on negligence"; id., comment (a), p. 16; undertakes the same comparative approach that is used in negligence; id., comment (d), p. 19; and is supported by the same policy considerations that support use of a reasonable person perspective in negligence. Id. Accordingly, while there are nominal differences, many courts and commentators view § 2 (b) as effectively requiring proof of negligence. See, e.g., *Aubin* v. *Union Carbide Corp.*, 177 So. 3d 489, 506 (Fla. 2015); *Wright* v. *Brooke Group Ltd.*, 652 N.W.2d 159, 168 (Iowa 2002); *Godoy* v. *E.I. du Pont de Nemours & Co.*, 319 Wis. 2d 91, 124, 768 N.W.2d 674 (2009) (Bradley, J., concurring); 2 D. Dobbs, Law of Torts (2001) § 353, p. 977; R. Cupp, Jr. & D. Polage, "The Rhetoric of Strict Products Liability Versus Negligence: An Empirical Analysis," 77 N.Y.U. L. Rev. 874, 883 (2002); F. Hubbard, " 'Sophisticated Robots': Balancing Liability, Regulation, and Innovation," 66 Fla. L. Rev. 1803, 1821 (2014); F. Vandall & J. Vandall, "A Call for an Accurate Restatement (Third) of Torts: Design Defect," 33 U. Mem. L. Rev. 909, 921 (2003).

Section 402A is a true strict liability standard. A product seller is "subject to liability to the user or consumer even though he has exercised all possible care in the preparation and sale of the product." 2 Restatement (Second), supra, § 402A, comment (a), p. 348. Foreseeability of harm is not an element of the plaintiff's prima facie case. See *Vendrella* v. *Astriab Family Ltd. Partnership*, 311 Conn. 301, 307 n.7, 87 A.3d 546 (2014) ("[s]trict liability means liability without proof that the defendant was negligent, i.e., that the defendant failed to take reasonable steps to prevent a foreseeable harm"). Foreseeability is only relevant to a *defense* that the product was not put to a foreseeable *use;* see General Statutes § 52-572*l* (codifying common-law defense of misuse); *Norrie* v. *Heil Co.*, 203 Conn. 594, 600, 525 A.2d 1332 (1987) ("[m]isuse occurs when a product is not used in a manner which should have been foreseen by the defendant" [internal quotation marks omitted]); or to a request for a reduction of damages due to the plaintiff's comparative responsibility for his injuries. See General Statutes § 52-572o.

Although the availability of an alternative design could be relevant under either of our tests under § 402A, neither requires such proof. Indeed, under our primary

modified consumer expectation test, a plaintiff may establish liability solely by reference to the product sold, upon proof that its risks outweigh its utility. It bears emphasizing that this risk-utility balancing does not limit liability to products that are of excessively low utility and exceedingly high risk, as does the "manifestly" unreasonable standard in the Restatement (Third).

On its face, therefore, the Restatement (Third) would appear to make consequential changes to our product liability law. According to the plaintiff, adopting the Restatement (Third) would make product liability cases significantly more expensive to litigate; in many cases requiring expert testimony/product prototypes to establish that the alternative design is reasonable. As such, he contends it will be more likely that cases will be decided on pretrial motions testing the adequacy of this proof and that injured consumers with smaller damages will be unable to bring product liability actions at all.

In response, the defendant and some of the amici contend that adoption of the Restatement (Third) would not significantly alter our law *in practice*, because plaintiffs typically elect to proffer proof of an alternative design. The defendant does not, and could not, claim, however, that plaintiffs have ever assumed the burden of proving that the harm was foreseeable. Moreover, the defendant's argument does not account for the fact that the adequacy of this proof has generally not been the subject of serious controversy and pretrial motions because plaintiffs have not been required to prove the reasonableness of the alternative design to prevail.

D

Whether the Restatement (Third) Should Be Adopted

In his concurring opinion in *Izzarelli*, Justice Zarella set forth several reasons why he believes that, regardless of the degree of difference, the greater clarity and objectivity that the Restatement (Third) provides over our current standards favors its adoption. See *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, supra, 321 Conn. 217–43 (*Zarella, J.*, concurring). Putting aside the question of any purported advantages that could be gained from adoption of the Restatement (Third), we note the following considerations that weigh against its adoption.

We have followed § 402A's strict liability standard for more than five decades. We have only modified that standard to the extent that it was necessary to fill a gap in our law; *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 219–20; or to clarify the field of operation of those tests to a case before us. *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, supra, 321 Conn. 192.

In the almost two decades since this court adopted our modified consumer expectation test in *Potter*, there has been no evidence that our § 402A strict liability tests have proved to be unworkable. Not a single case

applying Connecticut law has been brought to our attention demonstrating either that a jury had difficulty applying our law or that a jury's verdict yielded a bizarre or unconscionable result. Indeed, we noted in *Izzarelli* that we would trust our trial courts to safeguard against any such result. See id., 205.

In those two decades since *Potter*, there is also no indication that any action has been undertaken to seek changes to our tests. No party has ever asked this court to modify those tests, or to reconsider the Restatement (Third) in light of the failure of the court in *Potter* to address its exceptions to the alternative design requirement. See footnote 12 of this opinion; see also Restatement (Third), supra, § 2, reporters' note, comment (d), part II C, pp. 72–73 (asserting that *Potter* had misinterpreted Restatement [Third] to impose per se requirement). No interest group has sought change legislatively. Shortly before the court's decision in *Potter*, the Connecticut Business and Industry Association drafted a bill that sought to amend our act to incorporate the definition of design defect in the draft Restatement (Third). See Raised House Bill No. 5709, 1996 Sess.; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 1996 Sess., p. 1119, remarks of Elizabeth Gara, assistant counsel for the Connecticut Business and Industry Association. That bill was not acted on by the Judiciary Committee after it heard competing views on it at a public hearing. Since *Potter*, other legislation has been proposed to amend the act; see Raised Bill No. 5731, 2002 Sess. (proposing to preclude evidence of subsequent remedial measures in product liability actions); see also Public Acts 2011, No. 11-200, § 1 (amending limitation period for asbestos related product liability claims); but none that would have changed our product liability standards.

An argument that our standard is unworkable because it lacks an "objective" basis for decision-making was implicitly rejected in *Potter*, and is both circular and contradicted by experience. The presumption on which this argument rests is that failing to require proof of a reasonable alternative design in a risk-utility test deprives the fact finder of an objective basis for decision-making because it lacks an alternative against which to compare the marketed product. The flaw in this argument is that it assumes that a product cannot be unsafe unless it can be made safer. If the fact finder's task is to determine whether the defendant could have made a safer product, it necessarily follows that the absence of an alternative design makes this task impossible. If, however, the fact finder's task is to assess whether the product is unreasonably dangerous because its risks exceed its utility, no comparison to an alternative is necessary. The fact that jurors commonly engage in such a balancing test whenever they are called upon to assess reasonableness, such as in a claim of negligence, evidences that such weighing is workable.

See 2 Restatement (Second), supra, § 291, p. 54 ("[w]here an act is one which a reasonable man would recognize as involving a risk of harm to another, the risk is unreasonable and the act is negligent if the risk is of such magnitude as to outweigh what the law regards as the utility of the act or of the particular manner in which it is done"); see also *Rodriguez* v. *Suzuki Motor Corp.*, 996 S.W.2d 47, 65 (Mo. 1999) ("the term unreasonably dangerous, as used in [§] 402A and [the model jury instructions], needs no judicial definition, whether derived from consumer expectations, risk-utility, or otherwise" [internal quotation marks omitted]). Indeed, even under the Restatement (Third), the fact finder weighs the risks and utility of each respective design before comparing the alternative design to the product sold.[13]

We also note that Connecticut's standard is hardly an outlier. It is not a fruitful exercise to attempt to obtain a precise count of how many jurisdictions have adopted or rejected the Restatement (Third) standard. Like every other aspect of this area of the law, parties on each side of this debate disagree about what legal standard has been adopted in the various jurisdictions and whether that determination should be made on the basis of how the court has articulated its standard or how the cases have been litigated.[14] It suffices for our purposes that several other jurisdictions apply similar standards to ours, some for many years. See, e.g., *Barker* v. *Lull Engineering Co.*, 20 Cal. 3d 413, 430, 573 P.2d 443, 143 Cal. Rptr. 225 (1978); *Tabieros* v. *Clark Equipment Co.*, 85 Haw. 336, 367–68, 944 P.2d 1279 (1997); *Delaney* v. *Deere & Co.*, 268 Kan. 769, 792–93, 999 P.2d 930 (2000); *Bustos* v. *Hyundai Motor Co.*, 149 N.M. 1, 13, 243 P.3d 440 (App. 2010). The jurisdictions that have most recently considered this issue have declined to adopt the Restatement (Third). See *Aubin* v. *Union Carbide Corp.*, supra, 177 So. 3d 510 ("In considering which approach is in line with our prior strict liability jurisprudence, we are in accord with those state supreme courts that have thoughtfully considered this issue and determined that the Third Restatement's new approach is inconsistent with the rationale behind the adoption of strict products liability. The Third Restatement is, in fact, contrary to this state's prior precedent."); *Tincher* v. *Omega Flex, Inc.*, 628 Pa. 296, 415, 104 A.3d 328 (2014) ("[T]he Third Restatement does not offer an articulation of the law sufficient to persuade us to simply abandon the Second Restatement formulation of the strict products liability cause of action and 'move' to the Third Restatement. Unlike the Third Restatement, we believe that the Second Restatement already adopted, and properly calibrated, permits the plaintiffs to tailor their factual allegations and legal argumentation to the circumstances as they present themselves in the real-world crucible of litigation, rather than relying upon an evidence-bound stan-

dard of proof."). Other jurisdictions rejected the Restatement (Third) in the years following its final adoption by the American Law Institute in 1997.[15] The varied standards nationally undermine the defendant's argument that Connecticut manufacturers would be at a competitive disadvantage if we declined to adopt the Restatement (Third).

In addition to the lack of evidence that our Restatement (Second) standard is unworkable, we are not persuaded that the Restatement (Third) fully addresses all of the concerns that previously led this court to reject the draft Restatement (Third). The court in *Potter* did not address whether it would be appropriate to require plaintiffs to prove that the risk of harm was foreseeable. Nonetheless, such a requirement would be manifestly inconsistent with the court's concern in *Potter* about the burdens of expert testimony; *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 217–18; and its unequivocal determination that policy considerations favored adherence to strict liability.[16] Id., 221–22. In some cases, plaintiffs would have to obtain expert testimony to prove that the risk was foreseeable in light of the state of scientific and technical knowledge at the time the product was manufactured. Moreover, the court's allegiance in *Potter* to § 402A reflects that, as between injured consumers who lack the ability to protect themselves physically and/or financially from the product's danger and a manufacturer who might not be able to foresee the risk of harm, Connecticut would strike the balance in favor of injured consumers. See id., 209; see also *Wagner* v. *Clark Equipment Co.*, 243 Conn. 168, 194, 700 A.2d 38 (1997) ("[s]trict products liability is based on a policy that assumes that certain losses are better distributed in our society not on the basis of fault, but rather with regard to the ability of the involved parties to absorb them" [internal quotation marks omitted]).

With respect to the reasonable alternative design requirement, the court in *Potter* expressed a concern that such a rule would preclude valid claims for products for which there is no alternative design. *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 217–19. Although the Restatement (Third) provides some exceptions to this requirement, they are exceedingly limited in their operation. Of particular concern is the narrow scope of manifestly unreasonable designs, which excuses this requirement only for products of negligible utility. This standard will not apply "in most instances even though the plaintiff alleges that the category of product sold by the defendant is so dangerous that it should not have been marketed at all." Restatement (Third), supra, § 2, comment (d), p. 20. Thus, proof of a reasonable alternative design would be required even if the design creates a risk of grave injury or death, as long as the product has some appreciable utility. Moreover, the Restatement (Third) would

seem to immunize certain classes of products, like novel products for which there is no alternative design. See *Tincher* v. *Omega Flex, Inc.*, supra, 628 Pa. 408 (declining to adopt Restatement [Third] in part because "[t]he approach suggests a priori categorical exemptions for some products—such as novel products with no alternative design—but not others," citing similar concern expressed by this court in *Potter* as support).

The court's concerns in *Potter* are not ameliorated by the argument of the defendant and some of the amici that evidence of a reasonable alternative design is routinely presented. As the Pennsylvania Supreme Court recently explained: "[R]elying upon a confined universe of reported appellate cases to draw evidence-based (versus principle-based) rules is problematic as a general matter in our mature legal system. This is so because the small class of cases posing issues of sufficient consequence to result in reported, precedential decisions naturally tends to raise narrow unsettled issues and/or fact-sensitive applications, rather than to provide vehicles to illustrate those parts of the law that are so 'well accepted' as to reflect emergent general rules. Of course, these cases may, by analogy and distinction, illuminate general principles at issue; but, purporting to limit the general rule to the facts of those cases is anathema to the common law. Stated otherwise, simply because in cases of factually-marginal applications courts have found evidence relating to alternative designs to be particularly probative and persuasive, in our minds, does not necessarily support a thesis that adducing such evidence is dispositive of whether a plaintiff has carried his/her burden of proof. . . . And, if adopted as a broadly applicable legal regime, the Third Restatement would engender a self-fulfilling prophecy by providing for a future restatement, going forward, of only those cases that meet the evidentiary threshold the regime permits." (Citation omitted.) Id., 413–14.

Indeed, even the product liability defense bar has admitted that the controversy surrounding adoption of the Restatement (Third) has not abated. See M. McWilliams & M. Smith, "An Overview of the Legal Standard Regarding Product Liability Design Defect Claims and a Fifty State Survey on the Applicable Law in Each Jurisdiction," 82 Def. Couns. J. 80, 83 (2015) ("[a] survey of the fifty states reveals no consensus with respect to application of either the consumer expectations test or the risk-utility test"); A. Purvis & S. Bailey, "Alternative Approaches to Alternative Design: Understanding the Reasonable Alternative Design Requirement and Its Different Applications," 82 Def. Couns. J. 185, 191 (2015) ("[s]eventeen years after the [American Law Institute] adopted the Third Restatement of Torts on the topic of product liability, lawyers across the country continue to wrestle with the reasonable alternative design requirement, including with whether it is [or should be]

a requirement at all").

We also observe that if we defer further consideration of the Restatement (Third) until such time as we have a case in which our current standards have demonstrated themselves to be unworkable or result in a manifest injustice, not only might we make a better informed decision, but the legislature might, in the interim, initiate its own reforms. The parties on each side of this issue have raised legitimate policy arguments in support of their respective positions. Public hearings on this issue and further study might yield the best result. We underscore that we do not conclude that this court *cannot* adopt the Restatement (Third), but simply that we *should not* do so at the present juncture. See *Tincher* v. *Omega Flex, Inc.*, supra, 628 Pa. 338 ("This [c]ourt has grown more careful over the years when presented with invitations to issue broad-based pronouncements in areas where it is apparent that such pronouncements are better suited to the information-gathering and give-and-take balancing of competing concerns available in the legislative arena. . . . That being said, the fact is that, in this particular area of the law, the [c]ourt has played a major developmental role; and when an issue is properly joined in a case, we are of course duty-bound to resolution and explication of the matter.").

Finally, although the defendant's arguments have not persuaded us that we should adopt the Restatement (Third) at this time, we have reexamined our standards in light of the concerns expressed by both parties to consider whether we could make refinements to our current strict liability standard to provide greater clarity. Having undertaken that inquiry, we make the following clarifications.

First, we agree that the labels of ordinary consumer expectation test and modified consumer expectation test are at best unhelpful and at worst misleading. To distinguish the tests in a manner more reflective of their application, we will call them the consumer expectation test and the risk-utility test. These labels also more closely conform to those used by many other jurisdictions.

Second, although our risk-utility test permits a plaintiff to elect whether to proffer evidence of a reasonable alternative design, it would be helpful to require the plaintiff to allege, and thereby put the defendant on notice, whether the product is claimed to be unreasonably dangerous because (a) a reasonable alternative design could have reduced or avoided the danger, or (b) the design of the product marketed is manifestly unreasonable in that the risk of harm from the product so clearly exceeds its utility that a reasonable, informed consumer would not purchase the product, or (c) both. Under either theory, the jury weighs the product's risks and utility. Only under (a), however, would the jury consider the availability of an alternative design and

compare that design's risks and utility to that of the product sold. Under (b), the jury would focus exclusively on the risks and utility of the product sold. We underscore that (b) is not limited to products of marginal utility; it applies to any product in which its risks clearly exceed its utility. The greater the utility, the greater the risk must be to render the product unreasonably dangerous. By segregating these risk-utility theories, we may gain a clearer picture of what, if any, problems these theories present in practical application.

Third, we recognize that, in most cases, plaintiffs will elect to proceed on the theory that the product is unreasonably dangerous because it lacked some feature that would have reduced or avoided the injury. This narrative is the one that is likely to be most persuasive to a jury, and not many products will be more dangerous than useful or fail to meet minimum safety expectations. Therefore, it would be helpful to clarify the plaintiff's burden of proof on this theory. In order to state a prima facie case that will permit the case to be submitted to the jury, the plaintiff must simply prove that the alternative design was feasible (technically and economically) and that the alternative would have reduced or avoided the harm. Although other factors may be relevant; see part II E of this opinion; a plaintiff's failure to present proof on other factors will not preclude the case from being submitted to the jury. We underscore that, as to economic feasibility, the plaintiff need not prove the precise cost of the alternative design. The plaintiff only need proffer sufficient evidence from which a jury could reasonably conclude that any increase in cost would not materially affect the desirability of the product in light of the benefit derived.

Fourth, we conclude that a defect may be established under our consumer expectation test by proof of the product's noncompliance with safety statutes or regulations or a product seller's express representations. Such noncompliance would establish the product's failure to meet consumers' legitimate, commonly accepted, minimum safety expectations. Moreover, the utility of the product would not excuse such noncompliance.

E

In light of the clarifications in *Izzarelli* and this opinion, we summarize the standards that govern a product liability claim, as that term is defined under our act. See General Statutes § 52-572m (b).[17]

All such claims, whether alleging a design defect, manufacturing defect or failure to warn defect, are governed by the same elements that this court has applied since it adopted § 402A: "(1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury

for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition." (Emphasis omitted; internal quotation marks omitted.) *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, supra, 321 Conn. 184–85; *Giglio* v. *Connecticut Light & Power Co.*, supra, 180 Conn. 234; accord *Rossignol* v. *Danbury School of Aeronautics, Inc.*, 154 Conn. 549, 562, 227 A.2d 418 (1967).

The plaintiff's theory of recovery dictates the scope of a further instruction on the second element. For a strict liability claim alleging design defect, the plaintiff may prove this element under the risk-utility test or under the consumer expectation test.

Under the risk-utility test, which will govern most cases, a product is in a defective condition unreasonably dangerous to the consumer or user if:

(1) A reasonable alternative design was available that would have avoided or reduced the risk of harm and the absence of that alternative design renders the product unreasonably dangerous. In considering whether there is a reasonable alternative design, the jury must consider the feasibility of the alternative. Other relevant factors that a jury may consider include, but are not limited to, the ability of the alternative design to reduce the product's danger without unreasonably impairing its usefulness, longevity, maintenance, and esthetics, without unreasonably increasing cost, and without creating other equal or greater risks of danger; or

(2) The product is a manifestly unreasonable design in that the risk of harm so clearly exceeds the product's utility that a reasonable consumer, informed of those risks and utility, would not purchase the product.[18] The factors that a jury may consider include, but are not limited to, the magnitude and probability of the risk of harm, the instructions and warnings accompanying the product, the utility of the product in relation to the range of consumer choices among products, and the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing.

Although the fact finder considers under either theory whether the risk of danger inherent in the challenged design outweighs the benefits of that design, these theories are not mutually exclusive. A plaintiff may consistently allege that a product had excessive preventable danger (reasonable alternative design) and that the product was too dangerous to market to the consumer irrespective of whether it could have been designed to be safer (manifestly unreasonable design).

Under the consumer expectation test, our secondary test, a product is in a defective condition unreasonably dangerous to the consumer or user only if it is "dangerous to an extent beyond that which would be contem-

plated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." 2 Restatement (Second), supra, § 402A, comment (i), p. 352. The product must fail to meet legitimate, commonly held, minimum safety expectations of that product when used in an intended or reasonably foreseeable manner. Those expectations may be informed by consumers' experience with the product, the seller's express representations, and product safety laws.[19]

### III

### FIRST CERTIFIED QUESTION

Having reaffirmed our allegiance to a strict liability standard under § 402A of the Restatement (Second), we turn to the first certified question, which asks: "Does [§] 402A of the Restatement (Second) of Torts (and [c]omment [i] to that provision) apply to a product liability claim for negligence under [the act]?" *Bifolck* v. *Philip Morris, Inc.*, supra, 2014 WL 585325, *8. This question requires us to consider the element of § 402A that imposes liability only when a product is in a "defective condition unreasonably dangerous to the user or consumer"; 2 Restatement (Second), supra, § 402A (1), p. 347; and the definition in comment (i) of unreasonably dangerous as limited to products that are "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Id., comment (i), p. 352.

Both parties agree that, under the Restatement (Second) and our act, a product liability claim may be brought under theories of strict liability and/or negligence. See footnote 17 of this opinion (setting forth statutory definition of product liability claim). The crux of the dispute is whether a single, unitary definition applies to all such claims, no matter the theory of recovery.

The defendant contends that the sole definition of unreasonably dangerous is a product that is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it . . . ." 2 Restatement (Second), supra, § 402A, comment (i), p. 352. It argues that our case law and the act support a unified definition of product liability, which is consistent with the practice of most jurisdictions. It suggests that negligence allows the plaintiff to elect to prove an additional element of manufacturer fault to provide a more appealing narrative to the jury.

The plaintiff clarified at oral argument before this court that, even under a theory of negligence, he effectively must prove that the product is in a defective condition unreasonably dangerous to the user. Nonetheless, he argues that the proof to establish this fact differs under negligence. He argues that common-law

negligence requires proof that the manufacturer breached its duty by failing to exercise reasonable care under the circumstances, not by failing to meet consumers' expectations. He contends that to conclude otherwise would preclude valid claims for injuries sustained by unintended but foreseeable users, like children who should have been protected by safety features that the ordinary consumer would not expect or require.

We agree with the defendant that no product liability action can succeed without proof of a defective condition unreasonably dangerous to the consumer or user. See Connecticut Civil Jury Instructions (4th Ed. 2012) § 3.10-1, available at http://www.jud.ct.gov/JI/Civil/Civil.pdf; 1 American Law of Products Liability (3d Ed. 2009) § 10:17, p. 37 ("[w]hether a claim of liability against a product manufacturer is based on negligence or on some other theory of liability, the manufacturer is liable only when the product is so defective as to render it 'unreasonably dangerous' "). Indeed, even before this court's adoption of § 402A, no action alleging injuries caused by the manufacture or design of a product based on negligence and/or warranty theories succeeded without evidence to this effect. See, e.g., *Handler* v. *Remington Arms Co.*, 144 Conn. 316, 321, 130 A.2d 793 (1957) (noting that plaintiffs had proved that ammunition cartridge was defective and had offered evidence "that the defendant, although knowing that the cartridge, if defective, would be an inherently dangerous article and a source of unreasonable risk of injury to those who might use it, permitted it to be available for future use without indicating by label or otherwise the danger to which the user would expose himself"); *Jump* v. *Ensign-Bickford Co.*, 117 Conn. 110, 118–19, 167 A. 90 (1933) (considering whether fuse for dynamite was defect of "imminently dangerous" character); *Burkhardt* v. *Armour & Co.*, 115 Conn. 249, 264–65, 161 A. 385 (1932) (considering seller's liability for product "in a dangerously defective condition"). Since this court adopted § 402A in 1965, and our legislature required all product liability claims to be brought as a statutory cause of action in 1979, our case law has reflected a consistent pattern of claims conforming to this element. Therefore, we agree that any product liability claim, no matter the type or theory, is governed by the same essential elements. See part II E of this opinion.

Nonetheless, we disagree with the defendant that there is a single definition for unreasonably dangerous, as provided in comment (i) to § 402A. The parties did not have the benefit of our decision in *Izzarelli* when they submitted their briefs and provided oral argument on this issue. Indeed, it is evident from the record that the parties assumed that the consumer expectation test would control the plaintiff's strict liability claim. Our decision in *Izzarelli*, however, not only clarified that a different strict liability test would control the present

case, but also negated an argument that a product is unreasonably dangerous only when it is dangerous to an extent beyond that contemplated by the ordinary consumer.

The court concluded in *Izzarelli* that the plaintiff in that case could not proceed under the ordinary consumer expectation test because "[a] cigarette that exposes the user to carcinogens and the attendant risk of cancer cannot be said to fail to meet an ordinary consumer's legitimate, commonly accepted minimum safety expectations."[20] *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, supra, 321 Conn. 203. The court then explained why comment (i) to § 402A is not a per se bar to the plaintiff's recovery under the controlling test: "Comment (i) to § 402A serves a limited role under the modified consumer expectation test. Although the modified test asks the jury to weigh various factors through the ultimate lens of the consumer's expectations, as a functional and practical matter that weighing process *supplants the definition in comment (i) of unreasonably dangerous*. Cf. *Wright* v. *Brooke Group Ltd.*, [supra, 652 N.W.2d 169–70] (concluding that comment [i] to § 402A does not apply after court adopted risk-utility test). In other words, the factors that the court in *Potter* identified essentially provide the jury with information that a fully informed consumer would know before deciding whether to purchase the product. See *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 221. When the consumer has specific product expectations that differ from those factors, those too may be factored into the weighing process. It could be that, in a given case, the consumer's expectations of the product would be the determinative factor. See *Blue* v. *Environmental Engineering, Inc.*, [215 Ill. 2d 78, 87, 828 N.E.2d 1128 (2005)] ([u]nder the risk-utility test, the open and obvious nature of the risk is just one factor to be considered within this range of considerations and it will only serve to bar the liability of the manufacturer where it outweighs all other factors to be considered in weighing the inherent risks against the utility of the product as manufactured); *Delaney* v. *Deere & Co.*, [supra, 268 Kan. 792–93] (rejecting open and obvious danger as precluding recovery and instead making that fact merely one of several informing consumer's expectations); *Evans* v. *Lorillard Tobacco Co.*, [465 Mass. 411, 428, 990 N.E.2d 997 (2013)] (noting that under risk-utility test, because reasonable consumer expectations are simply one of many factors that may be considered and not necessarily the determinative factor, the plaintiff was not obligated to prove that Newport cigarettes were more dangerous than consumers reasonably expected); *Tomasino* v. *American Tobacco Co.*, [23 App. Div. 3d 546, 548–49, 807 N.Y.S.2d 603 (2005)] (The mere fact that a risk presented by a product design is open and obvious, or generally known, and that the product thus satisfies expectations . . . may substan-

tially influence or even be ultimately determinative on risk-utility balancing in judging whether the omission of a proposed alternative design renders the product not reasonably safe. It follows that, while disappointment of consumer expectations may not serve as an independent basis for allowing recovery under [the design defect theory], neither may conformance with consumer expectations serve as an independent basis for denying recovery. Such expectations may be relevant in both contexts, but in neither are they controlling . . . .).

"*To allow the ordinary consumer's awareness of the product's potential danger to preclude recovery as a matter of law, however, would make Connecticut an outlier and defeat our intention in relegating the ordinary consumer expectation test to a more limited role.*" (Emphasis added; footnote omitted; internal quotation marks omitted.) *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, supra, 321 Conn. 208–10.

In addition to various policy arguments, the court in *Izzarelli* pointed to other aspects of our law that would be in tension with a conclusion that an essential element of every product liability action is that the product's dangers exceed those known to the consumer. Most significantly, we reasoned that "[o]ur legislature's express rejection of comparative or contributory negligence as a bar to recovery in a strict liability action [under our act] would be in tension with a sweeping immunity based solely on the consumer's knowledge."[21] Id., 199; see General Statutes § 52-572o (a) ("[i]n any claim under sections 52-240a, 52-240b, 52-572m to 52-572q, inclusive, or 52-577a, the comparative responsibility of, or attributed to, the claimant, shall not bar recovery but shall diminish the award of compensatory damages proportionately, according to the measure of responsibility attributed to the claimant"). Thus, in *Izzarelli*, we deemed our act to evidence a clear legislative intent not to preclude recovery due solely to the fact that the product's danger is open and obvious.

Accordingly, our decision in *Izzarelli* makes clear that comment (i) to § 402A does not provide a unitary definition of unreasonably dangerous that governs all product liability claims. See *Barker* v. *Lull Engineering Co.*, supra, 20 Cal. 3d 427 ("the term defect as utilized in the strict liability context is neither self-defining nor susceptible to a single definition applicable in all contexts"). For purposes of strict liability, a product may be unreasonably dangerous if it fails to meet consumers' minimum safety expectations or if its risks exceed its utility, because the consumer may know of the risk of danger but fail to fully appreciate that danger or know how safe the product could be made.

When negligence is a viable theory of recovery, consumer expectations have never been an element of that theory. Under our common law, "[t]he essential ele-

ments of a cause of action in negligence are well established: duty [of care]; breach of that duty; causation; and actual injury. . . . A duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." (Citations omitted; internal quotation marks omitted.) *Sturm* v. *Harb Development, LLC*, 298 Conn. 124, 139–40, 2 A.3d 859 (2010). The Restatement (Second) applies these elements to product liability generally; see 2 Restatement (Second), supra, §§ 394 through 398 (negligence of product manufacturers); 2 Restatement (Second), supra, §§ 399 through 402 (negligence of sellers of products manufactured by third persons); and design defects specifically. See 2 Restatement (Second), supra, § 398, p. 336 ("[a] manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design"). These provisions all reflect that it is the *defendant's* actual or imputed knowledge of the danger, not the plaintiff's, that is an essential element of negligence, which in turn gives rise to the defendant's duty to exercise reasonable care to protect product users from that danger.[22]

Applying this reasoning to the present case, it is clear that although § 402A fairly reflects the broad contours of the elements of all product liability claims, consumer expectations as set forth in comment (i) do not apply to a product liability claim premised on negligence, when such a claim is viable. To the extent that the defendant argues that many jurisdictions apply a single standard for all product defect claims, that fact does not speak to whether they require all claims to be proved in relation to consumer expectations. The broad acceptance of the risk-utility test plainly indicates that they do not. Indeed, even some courts that apply a consumer expectation test have not applied comment (i) to a claim of negligence. See, e.g., *Smith* v. *Central Mine Equipment Co.*, 559 Fed. Appx. 679, 681 (10th Cir. 2014) (summary judgment granted in favor of defendant on strict liability claim because dangers of drill rig were obvious but allowing negligence claim based on defective design for failure to install safety device to be submitted to jury); *Tabieros* v. *Clark Equipment Co.*, supra, 85 Haw. 369–70 ("The consumer expectation test for determining the defectiveness of products the use of which involve open and obvious dangers can result in finding products to be not defective that could easily have been designed safer without great expense or effect on the benefits or functions to be served by the product. . . . [I]n connection with a claim of negligent

design, the obviousness of [the] peril is [merely] relevant to the manufacturer's defenses [e.g., contributory negligence], and not to the issue of duty, and, therefore, does not, in itself, immunize the manufacturer from potential liability." [Citations omitted; internal quotation marks omitted.]); *Palmer* v. *Massey-Ferguson, Inc.*, 3 Wn. App. 508, 514–15, 476 P.2d 713 (1970) ("We feel constrained to comment on the proper scope of instructions setting out negligence in a products liability setting, since that theory is open as a nonexclusive alternative to the Restatement [Second] of Torts § 402A rule of strict liability. Negligence in products liability cases is unlike the warranty implied in law theory, which was swallowed up and renamed in the adoption of § 402A. . . . A beginning point for analysis of the requisites demanded for recovery in a negligence theory is Restatement [Second] of Torts § 395 . . . ." [Citations omitted.]); *Greiten* v. *La Dow*, 70 Wis. 2d 589, 603, 235 N.W.2d 677 (1975) ("Where a plaintiff proves negligence—in this case, the lack of ordinary care in the design of a product—there is no doubt that there may be recovery in the event the defective design results in an unreasonably dangerous product, but there may be recovery for the negligent design of a product even though it is not unreasonably dangerous in the [§ 402A] sense. All that it is necessary to prove is that the product is designed with a lack of ordinary care and that lack of care resulted in injury." [Footnote omitted.]).

Insofar as courts have concluded that the failure to prove that the product is in a defective condition unreasonably dangerous to the consumer would equally doom strict liability and negligence, we agree. We simply conclude that consumers' awareness of the danger will not preclude establishing such a condition unless it is an element of the applicable common-law theory. We therefore answer the first certified question "no."[23]

### IV

### PUNITIVE DAMAGES

Lastly, we turn to the second certified question, which asks: "Does Connecticut's common-law rule of punitive damages, as articulated in *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, [supra, 193 Conn. 208], apply to an award of statutory punitive damages pursuant to . . . § 52-240b, the punitive damages provision of the [act]?" *Bifolck* v. *Philip Morris, Inc.*, supra, 2014 WL 585325, *8. This question requires us to consider whether punitive damages under the act are limited to litigation expenses less costs. We conclude that they are not.

In considering this issue, we apply general rules of statutory construction; see General Statutes § 1-2z; *Martel* v. *Metropolitan District Commission*, 275 Conn. 38, 57, 881 A.2d 194 (2005); subject to a significant qualification. "While the legislature's authority to abro-

gate the common law is undeniable, we will not lightly impute such an intent to the legislature. . . . Thus, [w]hen a statute is in derogation of common law . . . it should receive a strict construction and is not to be extended, modified, repealed or enlarged in its scope by the mechanics of [statutory] construction. . . . In determining whether or not a statute abrogates or modifies a [common-law] rule . . . the operation of a statute in derogation of the common law is to be limited to matters clearly brought within its scope." (Internal quotation marks omitted.) *Chadha* v. *Charlotte Hungerford Hospital*, 272 Conn. 776, 788–89, 865 A.2d 1163 (2005).

We begin therefore with the common-law rule and then turn to the statute. In *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, supra, 193 Conn. 235, this court declined to reconsider limits that it had placed on the recovery of punitive damages. In doing so, the court explained: "Long ago, in *Hanna* v. *Sweeney*, 78 Conn. 492, 62 A. 785 (1906), this court set forth the rule which we have since followed regarding the appropriate measure of [common-law] punitive damages. In limiting our measure to the expense of litigation less taxable costs, the court noted that under the typical [common-law] rule the jury was permitted to exercise a virtually unchecked discretion to award damages not only to make the injured person whole, but to punish the wrongdoer. . . . The court further recognized that the doctrine of punitive damages which permits recovery beyond compensation prevailed in most jurisdictions, but, nonetheless, it refused to adopt such a rule characterizing it as a hybrid between a display of ethical indignation and the imposition of a criminal fine. . . . Thus, such a rule was found to be at a variance with the generally accepted rule of compensation in civil cases. . . . Since *Hanna*, we have consistently adhered to this view. . . .

"The subject of punitive damages has been one of great debate throughout the course of American jurisprudence. . . . Typically, those who disfavor punitive damage awards in civil cases point to the prospect that such damages are frequently the result of the caprice and prejudice of jurors, that such damages may be assessed in amounts which are unpredictable and bear no relation to the harmful act, and that the prospect of such damages assessed in such a manner may have a chilling effect on desirable conduct. . . .

"In permitting awards of punitive damages, but limiting such damages as we do, our rule strikes a balance—it provides for the payment of a victim's costs of litigation, which would be otherwise unavailable to him, while establishing a clear reference to guide the jury fairly in arriving at the amount of the award. Further, although our rule is a limited one, when viewed in light of the ever rising costs of litigation, our rule

does in effect provide for some element of punishment and deterrence in addition to the compensation of the victim. Thus, in limiting punitive damage awards to the costs of litigation less taxable costs, our rule fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, supra, 193 Conn. 236–38.

With the common law in mind, we turn to the punitive damages provision in the act. Section 52-240b provides: "Punitive damages may be awarded if the claimant proves that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers or others who were injured by the product. If the trier of fact determines that punitive damages should be awarded, the court shall determine the amount of such damages not to exceed an amount equal to twice the damages awarded to the plaintiff."

Although the statute is consistent with common-law punitive damages in one respect, it is inconsistent in many more. On the one hand, the statutory punitive damages are awarded on the basis of the same conduct that would justify an award of common-law punitive damages—reckless disregard of another's rights. See *Vandersluis* v. *Weil*, 176 Conn. 353, 358, 407 A.2d 982 (1978) ("[common-law] [p]unitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights"). On the other hand, the statutory damages are measured in relation to a multiple of compensatory damages, not litigation expenses. See *Hylton* v. *Gunter*, 313 Conn. 472, 486 n.14, 97 A.3d 970 (2014) (distinguishing other categories of statutory punitive damages, such as statutes limiting such damages to multiples of compensatory damages, from common-law punitive damages); *MedValUSA Health Programs, Inc.* v. *MemberWorks, Inc.*, 273 Conn. 634, 672 and n.3, 872 A.2d 423 (*Zarella, J.*, dissenting) (drawing same distinction and citing General Statutes §§ 35-53 [b] and 52-240b as examples), cert. denied sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005). In addition, the statute vests the court with exclusive authority to determine the amount of damages, whereas the trier of fact traditionally had determined the amount of common-law punitive damages.[24] See *Matthiessen* v. *Vanech*, 266 Conn. 822, 826, 836 A.2d 394 (2003); *Kenny* v. *Civil Service Commission*, 197 Conn. 270, 277, 496 A.2d 956 (1985); *Gionfriddo* v. *Avis Rent A Car System, Inc.*, 192 Conn. 280, 295, 472 A.2d 306 (1984); *Vogel* v. *Sylvester*, 148 Conn. 666, 673, 174 A.2d 122 (1961); *Hanna* v. *Sweeney*, supra, 78 Conn. 493; *Perkins* v. *Colonial*

*Cemeteries, Inc.*, 53 Conn. App. 646, 647, 734 A.2d 1010 (1999); see also *Proto* v. *Bridgeport Herald Corp.*, 136 Conn. 557, 571, 72 A.2d 820 (1950).

Indeed, it was precisely because juries assessed the amount of punitive damages that this court was motivated to adopt the common-law rule, limiting the exercise of the jury's discretion by tying such damages to litigation expenses. See *Hanna* v. *Sweeney*, supra, 78 Conn. 493. Notably, by vesting the court with authority to determine the amount of punitive damages and by limiting the amount of those damages in the act, the legislature provided an alternative method of reining in excessive punitive damages, the very policy concern that prompted this court to limit common-law punitive damages. Cf. *Ulbrich* v. *Groth*, 310 Conn. 375, 451, 78 A.3d 76 (2013) ("[i]t is reasonable to conclude that the legislature provided that a claim for punitive damages under [the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.] should be submitted to the trial court, and not the jury, because it believed that the court would be aware of the range of punitive damages that have been awarded for similar CUTPA violations, that it would be less likely to be swayed by appeals to emotion and prejudice, and, therefore, it would be less likely to render an award that was an outlier").

There are other factors that inform our conclusion. If we were to construe the act to equate the statutory punitive damages to litigation expenses, in some cases the statute would have no effect or frustrate the purpose of the common-law rule. In any case in which litigation expenses are less than two times the damages, the statute would have no impact whatsoever, as the common-law recovery would already have been available. In any case in which the plaintiff's compensatory damages are relatively low in comparison to his or her litigation costs, the cap limiting punitive damages to twice compensatory damages would frustrate the purpose of common-law damages—"fully compensating a victim for the harm inflicted on him." *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, supra, 193 Conn. 238. This disparity would not be uncommon given the statutory reduction of compensatory damages in relation to comparative responsibility.[25] See General Statutes § 52-572o. Attorneys may be disinclined to take complex design defect cases when the plaintiff's injuries are modest, which in turn would remove an incentive for manufacturers to make safety improvements.

Another factor that has influenced this court to distinguish an award of statutory punitive damages from common-law punitive damages is when the statutory scheme also authorizes an award of attorney's fees. See *Ulbrich* v. *Groth*, supra, 310 Conn. 450–51; *Smith* v. *Snyder*, 267 Conn. 456, 469–71, 839 A.2d 589 (2004). Attorney's fees also may be awarded under the act,

although not under the same circumstances as common-law punitive damages. Pursuant to § 52-240a, "[i]f the court determines that the claim or defense is frivolous, the court may award reasonable attorney's fees to the prevailing party in a products liability action." When an award of attorney's fees pursuant to § 52-240a and an award of punitive damages pursuant to § 52-240b are both applicable, the combined effect of such awards would be substantially similar to another statute that this court has interpreted to have punitive damages not limited by the common-law rule. *Smith* v. *Snyder*, supra, 267 Conn. 469–70 (concluding that punitive damages awarded under § 35-53 are not common-law punitive damages where statute provided: "if the court finds wilful and malicious misappropriation, the court may award punitive damages in an amount not exceeding twice any award made under subsection [a] and may award reasonable attorney's fees to the prevailing party" [internal quotation marks omitted]).

If punitive damages in § 52-240b were interpreted to mean common-law punitive damages, then both §§ 52-240a and 52-240b would provide for attorney's fees, but under different conditions. See *Berry* v. *Loiseau*, 223 Conn. 786, 832, 614 A.2d 414 (1992) ("[l]itigation expenses may include not only reasonable attorney's fees, but also any other nontaxable disbursements reasonably necessary to prosecuting the action"). Several concerns arise from this construction. First, attorney's fees under § 52-240a are not capped, as are punitive damages in § 52-240b. It is difficult to fathom why the legislature would have deemed the defendant's assertion of a frivolous defense to merit a harsher penalty than the defendant's injury causing reckless disregard for others' safety. Second, in cases in which a prevailing plaintiff has established both reckless disregard of safety and frivolous litigation conduct, the defendant would not be penalized for one of those wrongful acts. Which wrongful act was punished would depend on which statute provided greater recovery. In either case, one statute's purpose would not be fulfilled. Thus, unsurprisingly, in the only case in which a prevailing plaintiff sought to recover under both §§ 52-240a and 52-240b, the trial court did not interpret the latter as subject to the common-law rule. See *Roome* v. *Shop-Rite Supermarkets, Inc.*, Docket No. CV-02-0281250-S, 2006 WL 2556572, *4–5 (Conn. Super. August 16, 2006); see also *R.I. Pools, Inc.* v. *Paramount Concrete, Inc.*, 149 Conn. App. 839, 874–75 and nn.18 and 19, 89 A.3d 993 (noting that neither party had taken issue with trial court's determination that punitive damages under § 52-240b follow common-law rule and further noting that trial court had not considered award of attorney's fees under § 52-240a), cert. denied, 312 Conn. 92, 94 A.3d 1200 (2014). In sum, the weight of these inconsistencies supports a conclusion that punitive damages under § 52-240b are not measured by the common-law rule. See

*Kyrtatas* v. *Stop & Shop, Inc.*, 205 Conn. 694, 699–700, 535 A.2d 357 (1988) (because common-law doctrine of indemnification is inconsistent with provisions of act concerning comparative responsibility, award of damages, and contribution, act abrogates common-law doctrine).

To the extent that the defendant contends that construing the statute other than by the common-law rule would frustrate the overarching purpose of the act, which is to limit insurance costs for product liability actions, the legislative history of the act does not support the defendant's construction. The punitive damages provision was added to the proposed bill after consumer interests spoke in opposition to the original bill, which was far less favorable to the consumer than the final bill in various respects. See Committee Bill No. 5870, 1979 Sess.; Substitute House Bill No. 5870, 1979 Sess.; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1979 Sess., pp. 591–92. The proposed punitive damages provision manifestly intended the broader measure of such damages, not litigation expenses. The proposed provision was taken almost verbatim from the Draft Uniform Product Liability Law published by the United States Department of Commerce. 44 Fed. Reg. 2996 (proposed January 12, 1979); see *Elliot* v. *Sears, Roebuck & Co.*, 229 Conn. 500, 505–506, 642 A.2d 709 (1994); compare 44 Fed. Reg. 3002, § 120 (January 12, 1979), with Substitute House Bill No. 5870, § 8; see also footnote 26 of this opinion. The model provision was based on a newly enacted Minnesota statute that, like most other jurisdictions, does not fix punitive damages in relation to litigation expenses. See 44 Fed. Reg. 3019, § 120, analysis (January 12, 1979), citing Minn. Stat. Ann. § 549.21 (3) (West 1978); see also *MedValUSA Health Programs, Inc.* v. *MemberWorks, Inc.*, supra, 273 Conn. 672 (*Zarella, J.*, dissenting) ("for nearly a century, we have remained steadfast in our commitment to a common-law measure of punitive damages that is indisputably one of the most conservative in the nation"). The proposed provision provided no cap on punitive damages and provided instead various factors that the court should consider in fixing the proper award. See Substitute House Bill 5870, § 8; see also footnote 26 of this opinion. None of these factors related to litigation costs, but instead related to the wrongfulness of the defendant's conduct and the financial impact of that award and like awards on the defendant.[26] Thereafter, an amendment was adopted that substituted the cap on punitive damages in lieu of the unbridled discretion applying the various factors. See Substitute House Bill No. 5870, as amended by House Amendment A; 22 S. Proc., Pt. 14, 1979 Sess., p. 4626, remarks of Senator Salvatore C. DePiano (sponsor of act explaining that amendment would "place a limitation on the amount of punitive damages that would be awarded"). There is nothing to indicate that, in doing

so, the legislature intended to change the meaning of "punitive damages" as used in the proposed bill. No legislator referred to litigation expenses. In fact, one of the bill's sponsors recognized that, despite the amendment, the bill provided a benefit that had not previously been available to plaintiffs. See 22 H.R. Proc., Pt. 21, 1979 Sess., p. 7285, remarks of Representative Richard D. Tulisano (explaining that, in amendment, "we have put a cap on potential punitive damages that were in there which are a benefit to individuals"). As common-law punitive damages already were available for a tort committed in reckless disregard of another's rights, the statute must have provided some recovery that was not previously available.

We are mindful that the amendment eliminated the language providing that punitive damages could be awarded "in addition to attorney's fees . . . ." House Bill 5870, House Amendment A. There are numerous reasons, however, why that phrase may have been removed—it was not in the model law, it was superfluous because of the provision expressly providing for attorney's fees, or it might suggest that attorney's fees and punitive damages should be awarded on the same basis. We are not persuaded that the inclusion and then removal of this phrase is persuasive evidence either way. Therefore, we conclude that the legislative history lends no support to the defendant's construction and instead supports what the language of the statute strongly indicates—that statutory punitive damages are not measured by the common-law rule.

We answer the first certified question "No.

We answer the second certified question "No."

No costs shall be taxed in this court to either party.

In this opinion ROGERS, C. J., and EVELEIGH and ROBINSON, Js., concurred.

* December 29, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

This appeal was originally argued on April 22, 2015. On April 25, 2016, we ordered the parties to address certain questions in supplemental briefs and we then granted reargument in this appeal on September 13, 2016.

[1] Although the act commonly refers to General Statutes §§ 52-572m through 52-572q, which sets forth certain procedural and substantive requirements of product liability actions, the public act enacting these provisions, Public Acts 1979, No. 79-483, also enacted provisions codified at General Statutes § 52-577a, prescribing the statute of limitations and period of repose for product liability actions, and General Statutes §§ 52-240a and 52-240b, respectively prescribing attorney's fees and punitive damages for such actions. We use the term act to refer to all of these provisions.

[2] Comment (i) to § 402A of the Restatement (Second) of Torts provides in relevant part: "The rule stated in this [s]ection applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. . . . That is not what is meant by 'unreasonably dangerous' in this [s]ection. *The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. . . .* Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but

tobacco containing something like marijuana may be unreasonably danger-
ous. . . ." (Emphasis added.)

[3] That count also alleged theories of: (1) breach of implied warranty,
predicated on alleged statements by the defendant and its agent that the
defendant would notify the public and make changes to its product if it
learned that its cigarettes contained harmful ingredients; and (2) breach of
express warranty, predicated on the defendant's allegedly false statements
that Marlboro Light provided lower tar and nicotine than regular cigarettes.
A second count alleged loss of consortium.

[4] Section 1 of the Restatement (Third) simply provides that a commercial
seller or distributor is subject to liability for harm caused by defective
products. In part II C of this opinion, we address in further detail § 2, which
defines "Categories of Product Defect," and § 4, which dictates whether a
product may be deemed defective due to "Noncompliance and Compliance
with Product Safety Statutes or Regulations . . . ."

[5] We note with regard to our resolution of the first two issues (parts II
and III of this opinion), that, although the act consolidates the various
theories that could support a product liability claim as a statutory cause of
action; see footnote 17 of this opinion; it did not abrogate the common-law
elements of product liability claims under the various theories, except insofar
as it provided certain considerations relevant to failure to warn claims. See
General Statutes § 52-572m. This court previously recognized that, "because
[the] act does not delineate [the] elements of claims that it consolidates,
[the] common law provides [the] basis for theories of recovery . . . ." *Potter*
v. *Chicago Pneumatic Tool Co.*, 241 Conn. 199, 245 n.34, 694 A.2d 1319
(1997) (citing Second Circuit case for this proposition).

[6] For a more comprehensive discussion of the considerations guiding
development of this area of the law, see *Izzarelli* v. *R.J. Reynolds Tobacco
Co.*, supra, 321 Conn. 184–92.

[7] See, e.g., *Corneliuson* v. *Arthur Drug Stores*, *Inc.*, 153 Conn. 134, 214
A.2d 676 (1965) (implied warranty); *Hamon* v. *Digliani*, 148 Conn. 710, 174
A.2d 294 (1961) (breach of warranties and negligence); *Crotty* v. *Sharten-
berg's-New Haven*, *Inc.*, 147 Conn. 460, 162 A.2d 513 (1960) (implied war-
ranty); *Handler* v. *Remington Arms Co.*, 144 Conn. 316, 130 A.2d 793 (1957)
(negligence); *Gross* v. *Loft*, *Inc.*, 121 Conn. 394, 185 A. 80 (1936) (warranty
and negligence); *Burkhardt* v. *Armour & Co.*, 115 Conn. 249, 161 A. 385
(1932) (negligence); *Wolcho* v. *Rosenbluth*, 81 Conn. 358, 71 A. 566 (1908)
(negligence).

[8] "The elements of a strict liability action that this court derived from
§ 402A [of the Restatement [Second]) required the plaintiff to prove: (1) the
defendant was engaged in the business of selling the product; (2) the product
was in a defective condition unreasonably dangerous to the consumer or
user; (3) the defect caused the injury for which compensation was sought;
(4) the defect existed at the time of the sale; and (5) the product was
expected to and did reach the consumer without substantial change in
condition." (Emphasis omitted; internal quotation marks omitted.) *Izzarelli*
v. *R.J. Reynolds Tobacco Co.*, supra, 321 Conn. 184–85.

[9] Section 2 of the Restatement (Third) does not expressly exclude any
types of products. The comments, however, explain that another section of
the Restatement (Third), § 6, provides a different standard for two categories
of products, prescription drugs and medical devices. Restatement (Third),
supra, § 2, comment (k), p. 32. We have not asked the parties or amici to
address whether we should adopt § 6.

[10] Section 3 of the Restatement (Third) of Torts, Products Liability, pro-
vides: "It may be inferred that the harm sustained by the plaintiff was caused
by a product defect existing at the time of sale or distribution, without proof
of a specific defect, when the incident that harmed the plaintiff:

"(a) was of a kind that ordinarily occurs as a result of product defect; and

"(b) was not, in the particular case, solely the result of causes other than
product defect existing at the time of sale or distribution."

[11] See, e.g., *Standard Structural Steel Co.* v. *Bethlehem Steel Corp.*, 597
F. Supp. 164, 183 (D. Conn. 1984) (recognizing Connecticut law permits fact
finder to draw inference of defect from circumstantial evidence); *Kileen* v.
*General Motors Corp.*, 36 Conn. Supp. 347, 349, 421 A.2d 874 (1980) ("[t]he
fact finder can find, where other identifiable causes are absent, that the
mere evidence of a malfunction is sufficient evidence of a defect"); see also
annot., 65 A.L.R.4th 354–58 (1988) (listing twenty-seven states and District
of Columbia that allow establishment of prima facie case of design defect
based upon inferences from circumstantial evidence).

[12] The draft Restatement (Third) that was considered in *Potter* provided

these same three alternatives to § 2 (b). See Restatement (Third) of Torts, Products Liability, § 2 and comments, §§ 3 and 7 (Tentative Draft No. 2, 1995). The court in *Potter*, however, treated the alternative design requirement under § 2 (b) as absolute. See *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 215–19. It is unclear whether the court did so because it was unaware of these alternatives, or whether the court intentionally disregarded them, either because it had not been asked to consider adopting these provisions/comments or because of their marginal application.

[13] The notion that our current approach yields an unjust result because it dooms an entire product line without objective evidence is similarly unpersuasive. In any event, a jury verdict in favor of a plaintiff on a design defect claim does not result in a ban on the sale of the product. The manufacturer is free to weigh the risks and costs of injuries against the product's profits to determine whether to issue a recall or to continue sales.

[14] Although there is general consensus that most jurisdictions apply a risk-utility test, not every such test is the functional equivalent to the Restatement (Third). Our own law is a perfect example.

[15] See, e.g., *Mikolajczyk* v. *Ford Motor Co.*, 231 Ill. 2d 516, 545–46, 901 N.E.2d 329 (2008) ("By urging adoption of the Products Liability Restatement's formulation of the elements of a strict product liability design defect claim, [the] defendants seek a change in the substantive law of this state. This argument goes far beyond their assertion that the jury in this particular case was not properly instructed and would require our overruling [three cases], at least in part. We, therefore, decline [the] defendants' invitation to adopt [§] 2 [b] of the Products Liability Restatement. Thus, the existence of a feasible alternative design and the balancing of risks and benefits are relevant considerations in a strict product liability design defect case, but they are not elements of the claim that the plaintiff is required to plead and prove in every case."); *Delaney* v. *Deere & Co.*, supra, 268 Kan. 791–92 (declining to adopt Restatement [Third], citing controversy still surrounding it, lack of support from majority of jurisdictions, inconsistency of requirement of alternative design with Kansas law); *Rodriguez* v. *Suzuki Motor Corp.*, supra, 996 S.W.2d 65 (The court rejected the argument that it should adopt the Restatement [Third], citing case law concluding that "the term unreasonably dangerous, as used in [§] 402A and [its model jury instructions], needs no judicial definition, whether derived from consumer expectations, risk-utility, or otherwise. . . . Instead, the concept of unreasonable danger is to be treated as an ultimate issue for the jury. . . . Under this [c]ourt's reasoning, [a] signal virtue of such a general instruction is that it allows the jury to give the concept of unreasonable danger content by applying their collective intelligence and experience to the broad evidentiary spectrum of facts and circumstances presented by the parties. . . . Furthermore, the perceived need to define unreasonable dangerousness is largely satisfied by allowing the litigants to argue that the utility of a design outweighs its risks, or that consumer expectations were violated, or any other theory of unreasonable dangerousness supported by the evidence." [Citations omitted; internal quotation marks omitted.]); *Vautour* v. *Body Masters Sports Industries, Inc.*, 147 N.H. 150, 154–56, 784 A.2d 1178 (2001) (declining request to adopt Restatement [Third], citing concerns that "reasonable alternative design requirement would impose an undue burden on plaintiffs because it places a potentially insurmountable stumbling block in the way of those injured by badly designed products"; that it "may be difficult for courts and juries to apply," and that, while proof of alternative design is relevant in design defect case, it "should be neither a controlling factor nor an essential element that must be proved in every case" [internal quotation marks omitted]); *Godoy* v. *E.I. du Pont de Nemours & Co.*, supra, 319 Wis. 2d 107 ("Although we have recognized that the Restatement [Third] may offer new insights into product liability, we have neither adopted nor rejected it in its entirety. . . . Section 402A of the Restatement [Second] of Torts has remained the touchstone of our analysis for strict products liability." [Citation omitted; footnote omitted.]); *Godoy* v. *E.I. du Pont de Nemours & Co.*, supra, 107 n.8 ("[r]ecently, we stated that the Restatement [Third]'s definition of 'defective design' is 'fundamentally at odds with current Wisconsin products liability law' ").

[16] As such, although the court in *Potter* identified two specific concerns relating to the reasonable alternative design requirement, we do not read that decision to reflect every concern that the court may have had with the Restatement (Third) standard.

[17] General Statutes § 52-572m (b) provides: " 'Product liability claim' includes all claims or actions brought for personal injury, death or property

damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product. 'Product liability claim' shall include, but is not limited to, all actions based on the following theories: Strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent."

[18] The reasonable consumer standard in relation to a manifestly unreasonable design refers to the consumer to whom the product is marketed. Thus, when a product has been designed for and marketed to a limited group with specialized needs and/or knowledge, such as industrial equipment not suited for use by the general public, and the product is accompanied by adequate warnings, whether the product's design is manifestly unreasonable is determined by reference to the intended consumer.

[19] Other than circumstances in which the product fails to comply with safety laws or express warranties, we presume that circumstantial evidence will be used to establish a defect based on consumers' minimum safety expectations, under what we have referred to as our "malfunction theory." *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 612, 99 A.3d 1079 (2014). Conversely, we presume that a plaintiff seeking to prove a defect by direct evidence will proceed under our primary risk-utility test. We do not foreclose, however, the possibility that a plaintiff could proceed under the consumer expectation test with direct evidence of a defect that does not require expert testimony should a case arise in which it would be inappropriate to require the plaintiff to proceed under the risk-utility test. We are unaware of any such circumstances at the present time.

[20] The court recognized, however, "that a different conclusion might be warranted in cases in which the plaintiff (or decedent) began smoking before warning labels were mandated by federal law. See *Guilbeault* v. *R.J. Reynolds Tobacco Co.*, 84 F. Supp. 2d 263, 271 (D.R.I. 2000) ('most of the courts considering the common knowledge of the general disease-related health risks of smoking have placed common knowledge at least at 1966 and some before'); see, e.g., *Spain* v. *Brown & Williamson Tobacco Corp.*, 363 F.3d 1183, 1194 (11th Cir. 2004); *Insolia* v. *Philip Morris, Inc.*, 216 F.3d 596, 600 (7th Cir. 2000); *Estate of White* v. *R.J. Reynolds Tobacco Co.*, 109 F. Supp. 2d 424, 432–33 (D. Md. 2000); *Tillman* v. *R.J. Reynolds Tobacco Co.*, 871 So. 2d 28, 33 (Ala. 2003); *Miele* v. *American Tobacco Co.*, 2 App. Div. 3d 799, 802, 770 N.Y.S.2d 386 (2003)." *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, supra, 321 Conn. 203 n.16.

[21] We also explained that "precluding liability solely because the product's dangers were open and obvious would be in tension with" this court's determination in *Potter* regarding the scope of admissible state of the art evidence. *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, supra, 321 Conn. 199 n.14. We noted that *Potter* had held that "state of the art refers to what is technologically feasible, rather than merely industry custom." (Internal quotation marks omitted.) Id. In *Izzarelli*, we reasoned that "[t]he fact that an industry universally may design a product in a manner that poses a particular danger may provide notice to consumers of such a danger. To preclude liability due to such notice would negate the evidentiary value of the state of the art." Id., 199–200 n.14.

[22] Although some comments to the Restatement (Second) sections for negligence of product sellers acknowledge that contributory fault may arise when the danger is known to the consumer; see, e.g., 2 Restatement (Second), supra, § 398, comment (b), p. 336; such fault is not equivalent to the consumer expectation definition in comment (i) to § 402A. If legally available, such fault would be a defense, not an element of the plaintiff's prima facie case, and only if the plaintiff had acted unreasonably in the face of his knowledge. See *Stafford* v. *Roadway*, 312 Conn. 184, 191, 93 A.3d 1058 (2014); *Mazzucco* v. *Krall Coal & Oil Co.*, 172 Conn. 355, 358, 374 A.2d 1047 (1977); *Rohloff* v. *Fair Haven & Westville Railroad Co.*, 76 Conn. 689, 692–93, 58 A. 5 (1904). Such a defense is not available, however, for a claim under our act. Our legislature limited application of this common-law defense in 1973, and abolished it for product liability claims in 1979, when adopting that act. See Public Acts 1973, No. 73-622, § 1, codified at General Statutes § 52-572h (b) (limiting defense to preclude recovery only when plaintiff's negligence is greater than combined negligence of defendants); Public Acts 1979, No. 79-483, § 4, codified at General Statutes § 52-572o (comparative responsibility of plaintiff shall not bar recovery, but shall diminish award of compensatory damages proportionately).

[23] We are mindful that numerous courts and commentators have concluded

that a risk-utility balancing test for design defects like that under the Restatement (Third) is functionally equivalent to the reasonable person inquiry in negligence, which could give rise to the possibility of inconsistent verdicts if a jury were to find for the defendant on strict liability and for the plaintiff on negligence. See Restatement (Third), supra, § 2, comment (n), pp. 35–36 ("[T]wo or more factually identical design-defect claims . . . should not be submitted to the trier of fact in the same case under different doctrinal labels. Regardless of the doctrinal label attached to a particular claim, design . . . claims rest on a risk-utility assessment. To allow two or more factually identical risk-utility claims to go to a jury under different labels, whether 'strict liability,' 'negligence,' or 'implied warranty of merchantability,' would generate confusion and may well result in inconsistent verdicts."); see also id., § 2, reporters' note, comment (n), pp. 107–109 (citing cases). Conversely, several courts have concluded that a test that focuses on consumer expectations is sufficiently different from a negligence claim, at least when the plaintiff is a foreseeable but unintended user, that different outcomes would not be inconsistent. See, e.g., *Talkington* v. *Atria Reclamelucifers Fabrieken BV*, 152 F.3d 254, 263–64 (4th Cir. 1998) (applying South Carolina law); *Griggs* v. *BIC Corp.*, 981 F.2d 1429, 1438–39 (3d Cir. 1992) (applying Pennsylvania law); *Calles* v. *Scripto-Tokai Corp.*, 224 Ill. 2d 247, 271–72, 864 N.E.2d 249 (2007); see also *Bilotta* v. *Kelley Co.*, 346 N.W.2d 616, 622 (Minn. 1984) ("[w]hether strict liability or negligence affords a plaintiff the broader theory of recovery will depend largely on the scope of evidence admitted by the trial court and on the jury instructions given under each theory"). It appears that, in most cases, this concern has been addressed in the context of the facts and theories of the particular case rather than the court's adoption of a per se rule. See generally annot., 41 A.L.R.4th 9, Products Liability: Inconsistency of Verdicts on Separate Theories of Negligence, Breach of Warranty, or Strict Liability (1985 and Supp. 2016) (citing cases holding that there was no irreconcilable inconsistency in verdict for defendant on strict liability and verdict for plaintiff on negligence and cases reaching contrary conclusion).

To the extent that there is a valid concern that a jury should not be permitted to find that the product is not defective but nonetheless find in favor of the plaintiff on negligence, we assume that we have foreclosed that possibility by making clear in this opinion that the elements of a product liability claim apply to all theories. Moreover, we are unaware of any case applying our law in which a jury has rendered an inconsistent verdict on such claims, as plaintiffs have either elected to pursue one theory; see *Coburn* v. *Lenox Homes, Inc.*, 186 Conn. 370, 372, 441 A.2d 620 (1982) (negligent design and construction of septic system); or have jointly presented both without distinguishing them. See, e.g., *Wagner* v. *Clark Equipment Co.*, supra, 243 Conn. 190 (allegations that forklift was unreasonably dangerous because it lacked standardized warning system sufficient for use in industrial setting was basis for negligence and strict liability claims). If this court were to place limits on the availability or contours of negligence to safeguard against inconsistent verdicts, it would behoove us to do so in the context of a case implicating such concerns and the parties' arguments in relation thereto.

[24] We note that, despite repeated statements in the past that "the extent to which exemplary damages are to be awarded ordinarily rests in the discretion of the trier of the facts"; *Gionfriddo* v. *Avis Rent A Car System, Inc.*, 192 Conn. 280, 295, 472 A.2d 306 (1984); several more recent decisions reflect a trend toward having the trial court determine the amount of common-law punitive damages following a jury trial, thus implicitly limiting this statement to a determination of the entitlement to such damages. See *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, 306 Conn. 304, 313, 50 A.3d 841 (2012), cert. denied,      U.S.      , 133 S. Ct. 1809, 185 L. Ed. 2d 812 (2013); *Nelson* v. *Tradewind Aviation, LLC*, 155 Conn. App. 519, 530, 111 A.3d 887 (2015); *R.I. Pools, Inc.* v. *Paramount Concrete, Inc.*, 149 Conn. App. 839, 873–74, 89 A.3d 993, cert. denied, 312 Conn. 920, 94 A.3d 1200 (2014); *Metcoff* v. *NCT Group, Inc.*, 137 Conn. App. 578, 582, 49 A.3d 282 (2012); *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 165–66, 30 A.3d 703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal withdrawn January 27, 2012), cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012). We express no opinion on the plaintiff's contention that § 52-240b must be construed not to be limited by the common-law rule because he has a constitutional right to a jury determination as to the amount of common-law punitive damages.

[25] We recognize that a plaintiff could safeguard against such an outcome

by setting attorney's fees under a contingency fee agreement.

[26] Substitute Bill No. 5870, § 8, provides: "(a) Punitive damages, in addition to attorney's fees, may be awarded if the claimant shows by clear and convincing evidence that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers or others who were injured by the product.

"(b) If the trier of fact determines that punitive damages should be awarded, it shall determine the amount of such damages. In making such determination, the court shall consider: (1) The likelihood at the time of manufacture that a serious harm would arise from the product seller's misconduct, (2) the degree of the product seller's awareness of such likelihood of harm, (3) the profitability of the misconduct to the product seller, (4) the duration of the misconduct and any concealment of it by the product seller, (5) the attitude and conduct of the product seller upon discovery of the misconduct, (6) the financial condition of the product seller, and (7) the total effect of other punishment imposed or likely to be imposed upon the product seller as a result of the misconduct, including punitive damage awards to the persons similarly situated to the claimant and the severity of criminal penalties to which the product seller has been or may be subjected."